DUNCAN et al. v. PENN MUT. LIFE INS. CO. et al.—65 S. W. (2d) 882.

Eastern Section. March 27, 1933.

Petition for Certiorari denied by Supreme Court, June 24, 1933.

Kennerly & Key, of Knoxville, for appellant.

Norman B. Morrell, Fowler & Fowler, and Forrest Andrews, all of Knoxville, for appellees.

CASSELL, S. J. Suit filed in the chancery court of Knox county by Gordan A. Duncan, brother of J. C. Duncan, deceased, and Amie C. Duncan, former wife of said J. C. Duncan, deceased, against the Penn Mutual Life Insurance Company, East Tennessee National Bank, Mrs. Virginia Dingerson Duncan, second wife and widow of J. C. Duncan, deceased, and J. C. Duncan, Jr., individually and as administrator of his father, J. C. Duncan, deceased.

This bill alleged that complainant, Gordan A. Duncan, was a creditor of the estate of J. C. Duncan to the extent of $50,000 and his co-complainant, Amie C. Duncan, alleges that under a property settlement agreement made by J. C. Duncan, just before she obtained a divorce from him, his estate was indebted to her in the sum of $35,000, the insolvency of the estate of J. C. Duncan, deceased,

having been suggested in the county court. Same was administered in the chancery court as an insolvent estate. The bill further sought to set aside certain conveyances of real estate made by J. C. Duncan to the defendant Virginia Dingerson Duncan upon the theory that at the time these conveyances were made J. C. Duncan, deceased, was insolvent and that he was not then married to Virginia Dingerson Duncan, and, if any former marriage ceremony had been performed, it was void because Amie C. Duncan had obtained a divorce from the said J. C. Duncan upon the ground that he had openly lived in adultery with the said Virginia Dingerson Duncan. This bill also sought to have set aside the attempt by J. C. Duncan in his lifetime to change the beneficiary in $14,000 of life insurance issued by the Penn Mutual Life Insurance Company, a defendant, and in which Amie C. Duncan was originally named as beneficiary, the change of beneficiary being made to Virginia Dingerson Duncan. It was further alleged as to a fourth policy upon the life of J. C. Duncan, deceased, in the principal sum of $10,000 issued by said life insurance company, that the premium on this policy was paid by J. C. Duncan while he was insolvent, that the creditors of his estate were due that amount and on that account entitled to collect from the appellant a portion of the proceeds of the policy and an injunction was prayed and issued enjoining the Penn Mutual Life Insurance Company from paying the proceeds of said life insurance to Virginia Dingerson Duncan or to any other person.

The answer of the Penn Mutual Life Insurance Company was filed and likewise a cross-bill in which a full and complete history of its connection with the transaction are set out, and, inasmuch as counsel for the appellees allege that the statement of the pleadings contained in appellants' brief is correct, we copy the material parts of the pleadings contained in their brief. With respect to the four policies of life insurance involved, the cross-bill of the Penn Mutual Life Insurance Company describes their status as follows:

"Policy No. 557396 for $5,000 was issued May 12, 1911, as a limited payment life policy, premiums being payable for twenty years. This policy lapsed for non-payment of premiums on May 10, 1926.

"Policy No. 557820 for $5,000 was issued May 6, 1916, as a limited payment life policy, premiums being payable for twenty years. This policy lapsed for non-payment of premiums on May 10, 1926.

"Policy No. 940374 for $4,000 was issued August 5, 1920, as a limited payment life policy, premiums being payable for twenty years. This policy lapsed for non-payment of premiums on July 16, 1927.

"Said three policies of insurance as originally issued named the complainant Amie C. Duncan, who was then the wife of the insured J. C. Duncan, as the beneficiary. Thereafter, by written instrument dated October 11, 1928, the insured, having reserved the right to change the beneficiary, notified the appellant to change the designa-

tion of the beneficiary from the complainant Amie C. Duncan to 'my wife, Virginia Humphreys Duncan,' otherwise known as Virginia Dingerson Duncan.

"On September 19, 1928, the said J. C. Duncan made written application to the appellant for the reinstatement of said three policies of insurance, and as a part of his application, he was required to undergo a medical examination by the appellant's medical examiner, Dr. R. P. Wood.

"The three policies of insurance in question contained the following provision with respect to reinstatement after lapse for non-payment of premiums:

" 'In the event of default in premium payments, unless the cash value has been duly paid, it is agreed that this policy may be reinstated at any time upon evidence of insurability satisfactory to the company and the payment of all overdue premiums, and the payment or reinstatement of any other indebtedness to the company upon said policy, with interest at the rate of not exceeding six per cent per annum.'

"In his application for reinstatement of these policies, the following appears:

" 'I hereby request and certify that the answers to the following questions shall be considered as a part of and an amendment to my application for policy numbers 557396; 557820; 940374 in your company.'

"Following this caption, J. C. Duncan was asked the following questions and gave the answers indicated:

" '3. Are you in good health?

" 'A. Yes.

" '4. Have you had any sickness or injury since the above date (July 20, 1920)? Give the dates and particulars, including name and address of physicians consulted.

" 'A. None.

" '9. Has there been any change in your use of intoxicating liquors or drugs since the above date?

" 'A. No.'

"Concluding said application, the applicant, in writing, stated, after making the answers above set out:

" 'I hereby certify that my health is not impaired; that I have not consulted a physician during the past three years except as stated above, and I hereby declare that my answers to the foregoing questions are full, complete and true, and are made for the purpose of inducing the Penn Mutual Life Insurance Company to comply with the request as stated in Question No. 1 hereof, and it is understood and agreed that no liability on the part of the Penn Mutual Life Insurance Company shall arise under this health certificate until it has been approved at the Home Office of the company in the

City of Philadelphia, Pennsylvania, and the premium has been paid during my lifetime and good health.'

"This health certificate and application for reinstatement was then personally signed by the insured under the name of 'Josiah Cosby Duncan.'

"In the application to which this application for reinstatement was an amendment, Mr. Duncan had certified that as of July 10 1920, he did not use intoxicating liquors to any extent, and that he had been a 'practically total abstainer all my life.'

"In connection with this application for reinstatement, J. C. Duncan made the following answers and representations to the medical examiner in a statement which was signed by J. C. Duncan, to-wit:

" '11. A. Are you now in good health?

" 'B. When were you last attended by a physician, or consulted one?

" 'C. For what disease?

" 'D. Give details in full.

" 'E. Give name and residence of physician who attended you.'

" '(Ans.) A. Yes.

" 'B. June, 1917.

" 'C. Appendectomy.

" 'D. Dr. W. S. Nash, Knoxville General Hospital, three weeks.

" 'E. Dr. W. S. Nash, Knoxville, Tennessee.'

" 'F. Give name and residence of your medical advisor or family physician to whom you now refer for a certificate, if deemed necessary.'

" '(Ans.) Dr. Nash.'

" '13. A. Do you now use intoxicating liquors?

" 'B. To what extent?

" 'C. Have you ever used intoxicating liquors to excess? If so, explain the duration and extent of excess, and when last.'

" '(Ans.) A. No. B. No. C. No.'

" '16. Have you ever had illness, disease, injury or operation other than as stated by you above? If so, give full particulars, date, duration, severity, etc., of each. Use reverse side if necessary.'

" '(Ans.) No.'

"After answering these questions as a part of his application for reinstatement, the said Josiah C. Duncan, as a part thereof, made the following statement in writing:

" 'I hereby agree that all of the foregoing statements and answers made to the company's medical examiner are a part of my application for insurance, are declared to be full, complete, and true, and are offered to the company as a consideration for the contract.' "

The cross-bill alleges that each and all of the foregoing statements, answers, and representations were false, were willfully and fraudulently made, and that, in the making of said answers, the

applicant concealed facts material to the risk of loss. It is alleged that since said policies of insurance were issued, the said Josiah C. Duncan had become addicted to the excessive use of alcoholic drinks, had on numerous occasions become totally drunk, prostrated, and, from the excessive use thereof, had suffered from the ailment, illness, or disease known as acute alcoholism, and had been attended and medically treated therefor by a number of physicians in Knoxville, Tennessee, and other places; that on November 15, and succeeding days in the year 1927, he had been attended and treated therefor by Dr. T. A. R. Jones; that again, from April 3 to April 10, 1928, he had been attended and treated daily by Dr. T. A. R. Jones for acute alcoholism, and during said period had been confined in the Knoxville General Hospital, and there treated by said doctor and others for acute alcoholism.

It is further alleged that the death of the said J. C. Duncan was the direct result of nephritis and uremia, both of which were brought about by the excessive use of alcoholic drink.

The cross-bill further alleges that on October 11, 1928, after said J. C. Duncan had stood a medical examination for the reinstatement of the three policies already mentioned, he made written application to the appellant for an additional policy of insurance on his life in the sum of $10,000; that this policy was issued under date of October 26, 1928, but not delivered or the premium paid thereon until November 3, 1928. It is alleged that in his application for this $10,000 policy, which is Policy No. 1370342, said J. C. Duncan made false and fraudulent statements and representations about material matters, and likewise falsely and fraudulently concealed from the appellant material matters which, if known to the appellant, would have prevented it from accepting said applications and issuing said policy. It is averred that in this application for the $10,000 policy, the following false statements were made:

"11. A. Are you now in good health?

"B. When were you last attended by a physician or consulted one?

"C. For what disease?

"D. Give details in full."

(Ans.) "A. Yes.

"B. June, 1917.

"C. Appendectomy.

"D. Dr. W. S. Nash, Knoxville General Hospital, three weeks."

The applicant was then asked to give the name and residence of his attending physician and to give the name and residence of his then medical advisor, or family physician, to which questions he gave the name "Dr. Nash."

"13. A. Do you now use intoxicating liquors?

"B. To what extent?

"C. Have you ever used intoxicating liquors to excess? If so, explain the duration and extent of excess, and when last.

"D. Have you ever taken a cure for inebriety? Note 6."

(Ans.) "A. No.

"B. No.

"C. No.

"D. No."

Under question 16, the applicant was asked:

"Have you ever had illness, disease, injury or operation other than as stated by you above? If so, give full particulars, date, duration, severity, etc., of each."

To this the applicant answered "No."

The concluding sentence of this application is as follows:

"I hereby agree that all of the foregoing statements and answers made to the company's medical examiner are a part of my applicacation for insurance, are declared to be full, complete and true, and are offered to the company as a consideration for the contract."

The foregoing appears in the medical examination which was signed by the applicant. In his formal application to the appellant for this $10,000 policy, the following appears:

"My statement and answers to the question printed above, and my statements and answers made and given to the company's medical examiner are full, complete and true. Upon them I base my application for insurance, and agree that they shall be regarded as a part of the contract if and when issued. If the premium on the insurance herein applied for is not paid at the time of making this application, the contract of insurance shall not be in force unless and until a policy shall be issued and delivered to me and the first premium thereon actually paid during my lifetime in good health. . . . The foregoing agreements and declarations are made on behalf of myself and of my beneficiary under any policy on my life issued by the company upon this application."

The cross-bill then avers that the foregoing answers, statements, representations, and warranties contained in the application for the $10,000 policy were false in the same particulars as hereinbefore pointed out with respect to the application for the reinstatement of the three older policies.

It is averred that said false statements, misrepresentations, and concealments were fraudulently made with intent to deceive; and, furthermore, that they increased the risk of loss under said policies, and that had the true facts been known to the appellant, the lapsed policies would not have been reinstated, nor would the new $10,000 policy have been issued.

With reference to Policy No. 557820 for $5,000, the cross-bill alleges that, although it had lapsed for nonpayment of premiums long before the death of J. C. Duncan, yet, under the provisions of the

policy, it was still in force at the time of the death of the insured, under the temporary extended insurance provision, for the sum of $3,084.81, for which amount the appellant admits liability. With respect to that policy, the cross-bill was filed as a bill of interpleader, and the court was requested to determine the ownership of the proceeds of the policy and the adverse claimants thereto were enjoined from instituting separate suits, but were required to set up their claims in this cause.

The cross-bill further prayed that the other three policies, that is, the two remaining policies which had lapsed and the new $10,000 policy, be canceled and held void, and the appellant relieved of any and all liability thereunder, except the liability for the return of all premiums paid at the time of reinstatement of the lapsed policies and at the time of issuance of the new $10,000 policy. These premiums were tendered and paid into the registry of the court along with the filing of the cross-bill. Upon the fiat of the chancellor, an injunction was issued in accordance with the prayer of the cross-bill.

On October 25, 1929, J. C. Duncan, Jr., as administrator of the estate of J. C. Duncan, deceased, filed a cross-bill against the original complainants, and also against the defendants Penn Mutual Life Insurance Company, East Tennessee National Bank, Mrs. Virginia Dingerson Duncan, and J. C. Duncan, Jr., individually. The material averments of this cross-bill, in so far as they are pertinent to this appeal, are to the effect that said administrator, by reason of the insolvency of the estate of J. C. Duncan, deceased, at the time the $10,000 policy was issued and the three lapsed policies were reinstated, is entitled to recover the entire proceeds of the $10,000 policy, together with such premiums as were paid upon the other policies during the period of insolvency of J. C. Duncan, deceased.

On November 14, 1929, Mrs. Virginia Dingerson Duncan filed her demurrer and answer to the original bill. In this answer she claims the proceeds of the four policies of insurance in question. On the same date, to-wit, November 14, 1929, Mrs. Virginia Dingerson Duncan filed her demurrer and answer to the cross-bill of the appellant Penn Mutual Life Insurance Company. In her answer she likewise claims the proceeds of the four policies of insurance in question and denies the averments of the cross-bill with respect to the fraud and misrepresentations contained in the insured's application for reinstatement and for the issuance of said policies.

Mrs. Virginia Dingerson Duncan likewise filed a demurrer and answer to the cross-bill of J. C. Duncan, Jr., administrator, on the same date. In this answer she generally denies the averments of said cross-bill, and denies the right of the administrator to recover the proceeds of said insurance policies, or any part thereof.

On December 4, 1929, the defendants to the cross-bill of the ap-

pellant Penn Mutual Life Insurance Company filed their answers to said cross-bill, generally denying the averments thereof, and claiming that said policies were at the time of the death of the said J. C. Duncan in full force and effect, and claiming that they were entitled to collect the same for the benefit of the creditors of the estate of the decedent.

The demurrer of the defendant Virginia Dingerson Duncan to so much of the cross-bill filed against her by the administrator as sought to assert any claim against the $10,000 policy of insurance was sustained. The demurrer of cross-defendant Virginia Dingerson Duncan to the cross-bill of the appellant Penn Mutual Life Insurance Company was overruled. It is not necessary on this appeal to further notice said demurrers.

We call attention to a matter which occurred preliminary to the trial in the lower court, and which is the basis of one of the assignments of error:

"On the ———— day of April, 1930, after the case had been put at issue, the original complainant, Amie C. Duncan, by and through her solicitors of record, took the depositions of L. A. Bible, Mrs. Emma McCabe, A. M. McCabe and W. C. Rector, these depositions being taken before Edward Hacker, a notary public of Knox county, Tennessee. Neither the appellant nor its attorneys has any notice of the taking of these depositions, did not agree to the same, and were not given an opportunity to be present and cross-examine the witnesses. These facts are disclosed in the affidavit of C. W. Key, filed August 12, 1931. It further appears from this affidavit that said witnesses testified concerning the habits of said J. C. Duncan with respect to the use of intoxicating liquors prior to October, 1928; that the testimony of said witnesses is material to the issues involved in this case, and that one of said witnesses, L. A. Bible, in his deposition, testified that prior to October, 1928, he sold and furnished intoxicating liquors to the said J. C. Duncan, and that said J. C. Duncan was addicted at that time to the excessive use of intoxicating liquors; that said L. A. Bible was then (August 12, 1930) in the Federal Penitentiary at Atlanta, Georgia, on a liquor charge, and was beyond the jurisdiction of the court.

"On August 12, 1931, based upon this affidavit, the appellant filed a motion for an order upon the notary public taking said depositions, and upon solicitors for the complainants, requiring them to file said deposition in this cause.

"At the time of the filing of said motion, the appellant offered to pay the usual and customary charge for having said depositions transcribed, and it appeared further that the notary who had taken the depositions had agreed to furnish a copy thereof, provided counsel for the complainants would give their consent; that shortly after said depositions were taken, counsel for the complainants in-

structed the notary not to file said depositions, or to furnish to the appellant or its counsel a copy thereof.''

This motion was on September 5, 1931, overruled, to which action the appellant reserved an exception.

A large volume of proof was taken, after which the case was tried before the chancellor upon the pleadings and proof on December 23, 1931. On that date, the chancellor, by written opinion, sustained the cross-bill of the appellant as a bill of interpleader, in so far as it applied to the policy upon the appellant's admitted liability; with respect to the remaining three policies, the court held that the evidence did not sustain the averments of the cross-bill with respect to the false answers contained in the applications already referred to.

On December 23, 1931, a final decree was entered, following the conclusions announced by the chancellor in his opinion. In this decree, the appellant was taxed with three-fourths of the costs, and the remaining one-fourth was taxed against the cross-defendants to appellant's cross-bill. From this decree, the appellant prayed, was granted, and has perfected its appeal to this court.

In the decree, the chancellor held that Virginia Dingerson Duncan was entitled to the proceeds of Policy No. 557820, that being the policy upon which the appellant admitted liability. The proceeds of that policy have been paid, and it is no longer involved in this case.

The evidence in this case is very voluminous but the court is greatly helped by the very able and exhaustive briefs of counsel for all parties, and from these briefs and from a reading of the record page by page, we find the facts as follows:

J. C. Duncan was president of the People's Telephone & Telegraph Company in Knoxville for many years, and terminated this employment in 1927 when the company went out of business, being taken over by the Southern Bell Telephone & Telegraph Company. Complainant, Amie C. Duncan, was his first wife, but at some time prior to 1925 there was trouble between them, and, while they lived in the same home for a while, it seems that Mr. Duncan's marital relations with his first wife after this date were not very cordial and his habits were not very correct. These relations finally became so strained that it seems a property settlement was had between the parties on September 30, 1926, and Duncan agreed to pay his wife the sum of $250 per month and under certain conditions to furnish a lot and build a home for her to cost $10,000 and also to buy her an automobile, and in case there was a default in any of these payments she was to have a right of action against Duncan and was entitled to have securities or money set aside as would be the value of annuity for the amount stated, calculated upon her expectancy at the time the sum was paid. This agreement was

made in expectancy of a divorce proceeding which she afterwards began against him and did afterwards obtain on account of adultery. Default, it seems, was made in the payment of these amounts and hence the suit for $35,000, as alleged in the bill.

Notwithstanding Mr. J. C. Duncan's prominence as a business man, we find from the record that his life was not what we would call a moral one by any means. The record is full of evidence showing that not only was he immoral in that he was not faithful to his marital vows, but that he was given to the drink habit; we think he would be one that would be called an habitual drinker if not an habitual drunkard. The record in this case shows that, prior to the issuance of the $10,000 policy and the reinstatement of the other three policies, Duncan was confined in the Knoxville General Hospital and treated for "acute alcoholism." The hospital report shows that on April 3, 1928, he was admitted to the hospital and treated for the above disease by Dr. T. A. R. Jones. He was discharged a week later. Among other things prescribed for him was whisky; the hospital reports show that it was administered to him regularly, in fact, we might say every few hours for a large portion of the time while he was there, and it is a matter of general knowledge that in moderate doses whisky is a remedy for "acute alcoholism."

On May 27, 1929, Duncan was again admitted to the hospital for treatment of "Chronic Alcoholism." The record shows that he was drunk when admitted and there is evidence in the record showing that he must have been addicted to the use of alcohol for several years. His physician at that time was Dr. S. H. Hodge, who prescribed whisky in certain amounts to be given him every four to six hours. Upon this occasion he stayed in the hospital until the 10th of June, 1929, when he was discharged; an examination of the daily report shows that whisky was administered practically every few hours, almost every day, if not every day, during that time. He was again admitted to the hospital on the 22d of June, 1929, and placed under the care of the same doctor, Dr. Hodge, and treated for "acute alcoholism." The same treatment was prescribed as before and whisky was again administered and finally on the 2d day of July, after a ten-day stay he was released from the hospital.

While some of these admissions to the hospital do not antedate his applications for policies or for the reinstatement of lapsed policies in question, yet the first admission to the hospital and his treatment for acute alcoholism does antedate the application for these various policies and the other two admissions to the hospital and the evidence of witnesses show that the habit had grown on him to such an extent that it had become chronic and was so designated by the physician in charge. Dr. Jones, who waited on Duncan on

his first visit to the hospital, has testified in this case and excerpts from his testimony are given later on in this opinion.

Examining now more closely into the habits of Mr. Duncan as to the use of intoxicating liquors it is necessary to look somewhat into his life. It seems that while Duncan was living with his first wife he became acquainted with a Mrs. Virginia Dingerson, afterwards Mrs. Virginia Dingerson Duncan, who was a married woman living in East St. Louis, Illinois; in the spring of 1924, while she was yet a married woman, Duncan brought her to Knoxville and installed her in a room at the St. James Hotel. It seems that this illicit relationship with this woman continued until about the 1st of January, 1927, when Mr. Duncan's habits for drinking became so habitual and continuous and his conduct so disorderly that both he and Mrs. Virginia Dingerson were ejected from the St. James Hotel, and, shortly thereafter, or about that time, Duncan purchased a home on East Fifth avenue and moved this woman into this home. It seems that later Mrs. Dingerson obtained a divorce from her husband and she married Duncan some time in 1928. The drunken affair at the St. James Hotel occurred in January, 1927, and about a year and a half prior to the date of applications of the $10,000 policy and reinstatement of the three other policies hereinbefore mentioned. This affair at the hotel became so boisterous that it led to their ejectment by the police, and the manager of the hotel, one McSpadden, testified that Duncan was drunk and out of his head at the time and that the metal wastebasket in the room where they were was stacked full of whisky bottles, probably a dozen. The question is put directly to McSpadden as to J. C. Duncan's general reputation and he testifies that Duncan's reputation was that of a drunkard and a dangerous man. Mrs. McSpadden, who was living at the hotel at that time, also testified that Duncan's reputation while he stayed at the hotel was that of a drunkard.

Dr. T. Ap. R. Jones, a physician in Knoxville, testified that he was called to Duncan's house on November 15 and 16, 1927, to see Mr. Duncan and he then examined him and treated him for "acute alcoholism;" that Duncan was so drunk that he was confined to his bed. Dr. Jones further stated that he was called to treat Mr. Duncan again for the same ailment in April, 1928, and at that time he had him removed to Knoxville General Hospital and kept him confined there from April 3 to April 9 where he visited him and treated him daily. The hospital record is put in evidence by Miss Chambers, one of the nurses, who is, of course, a disinterested witness.

A portion of Dr. Jones' testimony is as follows:

"Q. State what symptoms Mr. Duncan had at the time you admitted him to the hospital. A. Well, he had some gastric trouble

and nausea and vomiting and was pretty restless and at times pretty ugly,—we could not control him very well.

"Q. Was he out of his head a part of the time? A. No, I could not say that he was, he was suffering from alcoholism, those people get mean sometimes, you know.

"Q. How did you ascertain, doctor, that Mr. Duncan was at that time suffering from alcoholism? A. From his symptoms and the admissions on the part of the patient.

"Q. Did Mr. Duncan tell you what brought on his condition, and if so, what did he say? A. No, I don't know that he did. I always inquire of these patients how much they have been drinking, and if they had had anything to drink since, but there is no doubt as to the diagnosis in the case.

"Q. Do you have any recollection as to how long Mr. Duncan said he had been drinking to excess? A. No, I do not.

"Q. Other than what he told you, do you have any other information as to his habits along about that time, or prior thereto? A. His wife personally appealed to me about his excessive drinking.

"Q. Which wife was that? A. His last wife."

Dr. Jones stated that he knew that Mr. Duncan had been accustomed for some time to take an occasional drink of liquor up until about four years prior to his death which occurred in July, 1929. From July, 1925, until his death he drank to excess. As to the treatment given Mr. Duncan while in the hospital Dr. Jones said:

"Q. While Mr. Duncan was in the Knoxville General Hospital on April 3, 1928, doctor, what sort of treatment did you give him? A. While he was in the hospital?

"Q. Yes. A. Well, the routine treatment for alcoholism which consists principally of first cleaning out the bowels, liquor diet, getting him so he could eat, and in the meantime such sedatives as would secure rest, sleep and quiet, and very frequently we have to resort to some liquor to do that.

"Q. What was the purpose of the liquor diet that you gave Mr. Duncan? A. To just taper him off from the habit that he has been indulging in for a week or ten days, or more. If we take them off too soon, we find they go into delirium, when you do that, and that is a rather disturbing condition and our hospitals are not prepared to take care of delirium patients.

"Q. That is delirium tremens? A. Yes sir."

Dr. Jones' testimony as to the effect of the excessive use of liquor upon the general health was as follows:

"Q. Does the excessive use of intoxicating liquor have any effect on any vital organs in the body? A. We think it does, but we hear every few days of men living to be eighty years old who have drank all their lives and it looks like it don't have much. That brings

up some question of resistance. Some individuals are endowed with a certain amount of resistance, while others are not.

"Q. Do you mean by that the heavy drinkers must have more resistance in order to throw off the harmful effects of too much intoxicating liquor or intoxicating drink? A. Yes, what I mean by 'resistance' is the nearest approach to a perfect physical system.

"Q. What organs of the body are most affected by the excessive use of intoxicants? A. The kidneys are supposed to go down under the use of excessive alcoholism.

"Q. Does or not the excessive use of alcohol have any tendency to produce nephritis? A. Yes, we see in many instances where we can trace nephritis to excessive alcoholism,—I don't mean alcoholism—but to the excessive use of alcohol.

"Q. What is nephritis, and explain how it affects the body? A. It is an inflammation of the mechanism of the kidneys which causes them to become in a chronic condition and the kidneys fail to do their duty in separating the poison from the blood, and then the poison being retained in the system is what is detrimental to the system and what causes death generally,—an over-supply of poison that should be eliminated.

"Q. Is there any connection between nephritis and uremic poisoning, or not? A. Yes, that is where you have the system overloaded with poison that should be eliminated.

"Q. With poison that should be eliminated? A. Yes.

"Q. In other words, uremic poisoning is or may be the result of nephritis? A. Yes, I don't see how you could get uremic unless you had a toxic infection."

Dr. Jones' testimony is very important we think because he was a physician chosen by Mr. Duncan and in whom he must have had confidence and furthermore he does not seem to have the slightest interest for testifying anything but the truth. In his testimony Dr. Jones gives the treatment for alcoholism or alcoholic patients and this treatment is the one prescribed for Mr. Duncan. Dr. Jones' testimony is corroborated by Miss Ada C. Lawhorn, a nurse who attended to Duncan when he was confined in the hospital in April, 1928, and this lady has been a registered nurse since 1919 and kept the larger part of the hospital chart previously mentioned in this opinion; she is not interested in the results of this suit. In this connection it might be well to say here that shortly after Duncan came out of the hospital in April, 1928, he married Mrs. Dingerson and that before the marriage she exacted from him a promise to refrain from the use of intoxicating liquors in the future, and this marriage occurred on May 28, 1928. This promise, however, was not kept because in January, 1929, which was within two or three months after he had represented to the Penn Mutual Life Insurance Company that he was and had always been a total abstainer, Dr.

Jones was again called to Duncan's home and found him drunk and suffering with symptoms of acute alcoholism. As stated before, he was in the hospital several times and it would seem that from January, 1929, until his death in July, 1929, he was continuously on a drunken spree of some kind. In May, 1929, Dr. S. H. Hodge was called to Duncan's home to treat him and found him drunk so he was immediately removed to the General Hospital where he stayed from May 27 to June 10. Dr. Hodge's testimony we copy somewhat at length because it is sufficiently important to merit this. It is as follows:

"Q. What sort of treatment did you give him during that length of time? A. We gave him whiskey in repeated small doses and also gave him bromides for nervousness and also maybe some calomel to get his liver to work better, and treated him systematically. He developed some diarrhea while he was there and I treated him for that also.

"Q. What produced that diarrhea, doctor? A. Well, he was unable to eat very much of anything and his stomach and bowels were very much disturbed.

"Q. Diarrhea is an irregular or disordered condition of the stomach and bowels? A. Yes.

"Q. Was that or not brought about by the alcoholic condition he was in and the complications arising from that? A. No doubt about it.

"Q. What was the purpose of the doses of whiskey given from time to time while he was in the hospital? A. Well, a part of the treatment in trying to sober a fellow up, as a usual thing, is not to cut his liquor off suddenly, but to give him repeated small doses, diminishing them as best we can, so as to get him sober with the least disturbance possible; you can control him better.

"Q. Now, in the condition that you found Mr. Duncan on May 27, 1929, when you first saw him, what would have been the effect of suddenly cutting off his liquor and not letting him have any more? A. In my opinion, he was apt to become very nervous, sleepless, and persons who have a very nervous system are very annoying to us that way.

"Q. Is there any danger of a patient going into delirium, or a delirium condition? A. Yes, that is possible.

"Q. Now, after he was discharged from the hospital on June 10, 1929, when were you next called to treat him? A. June 22, 1929, he was re-admitted to the same hospital.

"Q. What was Mr. Duncan's condition on June 22, 1929? A. Why he was drunk.

"Q. Was he in a better or worse condition on that occasion than he was when you previously admitted him to the hospital? A. His general condition was not any better.

"Q. How long was Mr. Duncan in the hospital on that occasion? A. He was there until the 11th of July."

In discussing the effect of the excessive use of alcoholic drink, Dr. Hodge said:

"A. Well, it would be calculated to disturb his digestion and render him nervous and upset him more or less generally, lower his resistance and vitality.

"Q. Does it have any effect on his liver and kidneys? A. Well, it would not have any good effect,—it would be calculated to impair him generally.

"Q. Doctor, if it appears that on November 15, 1927, and again on November 16, 1927, and again on April 3, 4, 5, 6, 7, 8, and 9, 1928, and again on January 21, 1929, Mr. Duncan was treated by Dr. T. Ap. R. Jones for acute alcoholism, and was again treated by you on the two occasions that you have testified about, from the examination you made of him and what you knew of his condition at the time you treated him, how long, in your opinion, had he been using intoxicating liquors to excess? A. Well, of my own knowledge, I could not say.

"Q. Give your professional opinion of how long. A. Well, he had been using it previous to those occasions.

"Q. Can man suddenly, by the use of intoxicating liquors to excess, get himself in the condition in which you found Mr. Duncan on May 27, 1929? A. No, I don't think so.

"Q. Would you or not say it is your professional opinion that he had been using intoxicating liquors to excess prior to the time of his first admission to the hospital back in April, 1928? A. Yes, that would be my opinion. . . .

"Q. You saw Mr. Duncan, you say, under the influence of liquor in May, 1929, for the first time when you were called. Could not that condition have been produced by drinking for a few days, even in a man who had not taken a drink for six months? A. Well, a man drinking quite a bit of liquor for several days could get in a rather bad shape, but then I don't believe he would show the nervous symptoms and other general symptoms that Mr. Duncan had.

"Q. Nervousness is not altogether the result of liquor drinking, is it? A. Oh no.

"Q. Isn't that largely constitutional? A. Well, it depends entirely on what you mean by the term 'nervousness.' What I had in mind in speaking of nervousness is general nervousness upsetting a man and disturbing his digestion and interfering with his sleep and restlessness.

"Q. Would all of that come to a teetotaler who had taken a couple of drinks of liquor for three or four days? A. It could, but he would recover quicker than Mr. Duncan did. . . .

"Q. Doctor, in your opinion, does an occasional spree leave a

permanent impairment to health? A. Yes, an occasional spree would, that is if it was kept up, it would be calculated to undermine one's health.

"Q. But that depends on how frequent the intervals are? A. Yes, and of how long duration also."

In addition to the testimony of Dr. Hodge who is likewise a disinterested witness, the testimony of Dr. Raulston, an interne, is taken to the same effect. The testimony of Mrs. Gehry, a friend of Mrs. Duncan (2d), who was a trained nurse, was taken and she detailed her association with Mr. and Mrs. Duncan covering a period from 1926 and continuing up until March, 1928, and she states that after the Duncans were ejected from the St. James Hotel, following Mr. Dunken's drunken brawl in 1927, she visited frequently in the Duncan home on Fifth avenue. Her testimony in part is as follows:

"Q. On these half dozen occasions that you were in the Duncan home, what did you observe there, if anything, with respect to Mr. Duncan's habits as to drinking intoxicating liquors? A. That was the chief form of amusement or entertainment, to be drinking.

"Q. What would Mr. Duncan drink on those occasions? A. Occasionally home brew, generally whiskey.

"Q. What size drinks would he ordinarily take, or did you ordinarily see him take? A. Out of a drinking glass, a water glass, a tumbler, I didn't see him use a whiskey glass or a wine glass.

"Q. But the ordinary drinking glass? A. Yes.

"Q. Now were you there in the home, Mrs. Gehry, on occasions when you did not see Mr. Duncan drink liquor or home brew? A. I was not.

"Q. Now would he always drink a glass full, or half full, or three-fourths, or what would you say as to what size drink he would take? A. I think it would be a half a glass and it was taken frequently in the course of a social afternoon.

"Q. And in the course of an afternoon, about how many drinks would Mr. Duncan himself take on occasions when you have seen him there in the home? A. I would say he would take a drink every thirty minutes, as nearly as you could average, on an occasion of that kind.

"Q. What apparent effect would it have on him, and how would he act after he was under the influence of liquor? A. Irritable, quick to take offense and easy to imagine things."

It seems that this Mrs. Gehry married in March, 1928, and that in April, 1928, Mrs. Dingerson had this conversation with the witness:

"Q. Just tell in detail, Mrs. Gehry, what transpired during that afternoon? A. She made the statement in my home that Mr. Duncan had been on a protracted drunk and had gotten beyond her con-

trol and that she could not do anything with him; that he had been drinking to the extent that he was almost bordering on delirium tremens, and that she wanted him to go to the hospital and that she had Dr. T. Ap. R. Jones try to get him to go to the hospital and she asked about my brother,—he was a friend of Mr. Duncan and she wanted to know if he was in Knoxville, that she thought he might have some control over him and his drinking.

"Q. Did she make any request of you about trying to get your brother to come here? A. That if my brother came to see me, or if I knew of his being in Knoxville, would I have him get in touch with her. . . .

"Q. After he was taken to the hospital in April, 1928, did you have occasion to have any other conversations with Miss Virginia? A. Yes, she came to my house again.

"Q. About when was that with reference to when he went to the hospital? A. About two days after he went to the hospital.

"Q. And what did she say on that occasion about Mr. Duncan's condition? A. She said when he was admitted to the hospital, his first request was for a drink and that the nurse, thinking he wanted a drink of water, brought him a glass of water and he refused it, saying that he wanted a drink of whiskey, that this was brought to him in a medicine glass, the size of which he objected to. . . .

"Q. Do you know, Mrs. Gehry, either from what Mr. J. C. Duncan himself has told you, or from what Mrs. Virginia Dingerson has told you, about how long Mr. Duncan had been drinking intoxicating liquors to excess? A. No, I do not.

"Q. Did you frequently observe Mr. Duncan in the year 1926 or 1927? A. Yes.

"Q. When you first met him, first became acquainted with him, what were his habits then, if you know? A. Drinking.

"Q. And when you last saw or associated with him, what were his habits? A. Still drinking.

"Q. Now from what you saw of him, would he drink once a week or once a month, or at more frequent intervals? A. Well, I have never seen him when he was not drinking."

Now the witnesses we have above quoted are witnesses who know, or should have known, about Mr. Duncan's habits. A number of witnesses testified on behalf of the beneficiary in the policy, Mrs. Dingerson Duncan, and she gave testimony, but from her reputation as disclosed in this record and from the unsatisfactory and evasive answers made by her we can give but little credit to her testimony; she does state, however, that in 1926 and after that time she occasionally drank whisky with Duncan, and, furthermore, that in April, 1928, when Duncan was in the hospital, she thought he was suffering from too much liquor.

A number of other witnesses testified to the effect that they either did not know that Mr. Duncan drank intoxicating liquors or that he drank them occasionally. These witnesses in the main, if not altogether, are witnesses who only saw him occasionally and were not familiar with his home life and some of them were not associated with Duncan at all during the years that he became addicted to this habit. Their evidence is mostly negative testimony.

Referring now to the testimony of one Mrs. Nelleville, a witness for appellee, it is stated that she was a friend of the family and had a room with Mr. and Mrs. Duncan and that one Leon Bible, bootlegger—now in the Atlanta penitentiary—delivered whisky to Mr. Duncan's home, and while she did not know how many times he delivered whisky there, she stated that she saw him frequently. This witness further said that she did not know of any drinks being stored or consumed in the home except East Tennessee corn whisky and home-brew.

We believe that we have now set out or referred to practically all of the material evidence in the case on the question of Mr. Duncan's drinking habits, at least, such as we think is entitled to credibility or which, under this record, comes from witnesses who had opportunity for knowledge on this point.

Before stating our conclusions on this testimony, in order to substantiate what we have just said as to the character of the testimony largely introduced by the appellees, we refer in part to the testimony of Mr. McMillan, witness of appellees:

"Q. After he sold out his stock in the People's Telephone and Telegraph Company, is it his reputation that he drank a great deal of intoxicating liquor? A. I will not say a great deal; I have heard he drank, but never heard of Joe getting on a spree or anything of that kind.

"Q. Did you hear in April, 1928, he was in the Knoxville General Hospital ten days recovering from a drunk spree? A. No.

"Q. And during that time he was confined at home and in bed for the same thing? A. No.

"Q. It is part of Mr. Duncan's reputation, is it not, that during the last two or three years of his life he drank a good deal of intoxicating liquor? A. I don't know. I never heard much about Joe then and did not see him much. I heard he had been drinking some whiskey, but at the times I saw him he was very dignified and walked like a judge, and you could not see anything of it."

The testimony of Mr. McMillan is substantially the testimony of the majority of witnesses for appellees on the question of Duncan's habits.

Giving due weight to all of the testimony contained in this record and considering the opportunities of the various witnesses for knowledge as to Duncan's habits, we are of the opinion that Duncan was

not only an habitual user of liquor but really a drunkard; prior to the time that he filed the applications and since then until the time of his death, one can come to no other conclusion from reading this record.

It should be noted that practically all of the officials and employees of the Penn Mutual Life Insurance Company, who were in office when Duncan's application came in, testified that according to the uniform rule and practice of the company in force at that time, if the facts concerning Duncan's habits had been revealed to them, the company never would have accepted the risk. It was also stated that it had been uniformly the custom of the company to reject applications for insurance when it was revealed that within the preceding two or three years prior to the filing of said application the applicant had suffered from acute alcoholism—such is the testimony of witnesses Yost, Schonck, Fredericks, Metius, and Storer. These are witnesses whose duty it was in one way or another to represent the company in passing on questions of this kind. The medical inspector, Dr. Hoare, testifies also on this point:

"Q. Doctor, I will ask you if the defendant Penn Mutual Life Insurance Company had a rule, practice and custom in September and October, 1928, in regard to whether or not it would approve for restoration applications based upon lapsed policies for non-payment of premiums, and for the issuance of new policies of insurance when applied for where the applicant or applicants had during the two or three years immediately preceding the application or applications been addicted to the excessive use of alcoholic liquors; my question is, did it have such a rule, custom and practice? Please answer the question, if you can, yes or no. A. Yes.

"Q. Now I will ask you what was this rule, custom and practice referred to in the preceding question, in September and October, 1928? A. The rule, custom and practice of this company was to decline such applicants applying for reinstatement or for new insurance.

"Q. Under that rule and practice, what was the custom for any action and decision of this company where it appeared that within a year and a half or two years previous to the receipt of such application the applicant had been treated by a physician on at least two occasions for acute alcoholism brought about by the excessive use of alcoholic liquors, and on one occasion being confined to a hospital some six or seven days? A. The action, according to our rules and custom at that time would be a declination.

"Q. Doctor, what effect does the excessive use of intoxicating liquors, to the extent of producing acute alcoholism, have, or is likely to have, upon the health of a man thus addicted. A. From our standpoint in the selecting of risks, it shortens longevity.

"Q. Now 'from our standpoint' I assume you mean by that,

from the standpoint of the insurance company which is considered issuing life insurance? A. Exactly.

"Q. State whether or not that is likewise so recognized generally by the medical profession, or not. A. It is."

We mention these things so that we may judge the effect that the concealment of these material matters had on the Penn Mutual Life Insurance Company; this concealment tends to convince us that, if the true facts had been revealed, as it was the duty of the applicant to reveal, these policies never would have been issued.

We have stated hereinbefore the facts concerning the issuance and reinstatement of the various policies and it is needless now to state these facts again, but we now refer to them and make them a part of our findings in the case. In addition to the facts concerning the issuance of the $10,000 policy and the reinstatement of the three policies aggregating $14,000, hereinbefore mentioned in this opinion, it should be noticed that the $10,000 policy was issued upon a formal application, dated October 11, 1928, for reinstatement of the three other policies and this application is attached to the policy itself. This is explained by the testimony of Mr. Martin, agent for the company, who says that under a rule of the company this was done. However, we do not see how this changes matters because, if the application for reinstatement contained false statements, then the use of such applications to obtain the issuance of the $10,000 policy would, of course, likewise avoid it, everything else being out of the way.

We deem it important to here quote the testimony of the company's agent on this point, which is as follows:

"Q. Mr. Martin, when the above policy No. 1370342 was issued was the assured Mr. Duncan required to submit to a further medical examination? A. No further than the one that was required to revive the other policies.

"Q. What is the general custom and practice of the Penn Mutual Life Insurance Company and other life insurance companies in regard to issuing one or more policies of life insurance on the same application and the same medical examination? A. Well, if you gentlemen have had any experience with insurance men you know when you get a man examined you have got all the doubts cleared away and you can do anything you want to up to a certain amount, $50,000 it requires two examinations. If we can get a man examined one time then any time within 60 days we can get as much insurance up to $50,000 issued as we can get him to take on that same examination.

"I will tell you what happened in this case: when this thing started I called Mr. Duncan's attention to the fact that the policies might be revived and put in full force by the payment of the premiums and that in order to do that I had to have him examined.

Now, as soon as that examination was approved and the company sent us the receipt showing the amount of the premiums, the net premiums which included three years, a three year dividends plus the interest and thus the policies were revived. Well, knowing that he at that particular time carried less than $50,000 insurance and he then only had the amount that we were reviving in force I suggested that he on this same examination apply for an additional $10,000 and he signed an application for it at that time, which was done and that policy was delivered as the last numbered one that you spoke of awhile ago. There was no further examination made and none was necessary.

"Q. It appears that there is attached to Policy No. 1370342 a photostatic copy of the report of Dr. Wood's examination made on September 4th, 1928. I will ask you if that is the examining physician's report on which your company relied in issuing that new policy for $10,000? A. Well, this is the upper portion of the examination. This is the application up there and this is the upper portion of the examination and runs down to there. That is the part—this other is for your information and this is the man's personal history down there, that second portion. There is never a photostat of that put into the policy. It is only the upper portion.

"Q. So as to get it clear the new $10,000 .policy was issued on the application which is filed as Exhibit No. 7 to your deposition and on Dr. Wood's examination dated September 4, 1928, that is Exhibit No. 7 to Dr. Wood's deposition. A. Yes.

"Q. And no new or additional medical examination was required? A. No, none whatever.

"Q. Now, Mr. Martin, state whether or not at the time Mr. Duncan made application for reinstatement of the three lapsed policies or at the time he made application for a new $10,000 policy you had any knowledge or information that in April, 1928, or in November, 1927, the insured Mr. Duncan had been treated by Dr. Jones or confined in any hospital taking treatment for acute alcoholism? A. No.

"Q. Did you have knowledge or information at either of those times that Mr. Duncan had ever taken any treatment or had ever suffered from acute alcoholism? A. No.

"Q. If you had known that approximately within six months before the application was made to you for the reinstatement of the three older policies that Mr. Duncan had been confined in the Knoxville General Hospital for a period of approximately seven days and had ever taken treatment for acute alcoholism, would you have recommended a reinstatement of those three policies or would your company have reinstated them? A. No, I don't think so.

"Q. From your experience as an insurance man what effect does the excessive use of intoxicating liquors have on the insurability of

a man? A. Well, he is looked on with a good deal of skepticism by the medical department. They are right rigid on those cases.''

Coming now to the assignments of error, the first four of which are as follows:

''1. The chancellor erred in not finding, adjudging and decreeing that the statements, answers, representations and warranties made by the said J. C. Duncan in his application for the reinstatement of the lapsed policies, and for the issue of the $10,000, policy, with respect to his health, his use of intoxicating liquors, his past medical treatment, etc., were false in the particulars set out in the cross-bill, and in not relieving appellant from liability under said policies by reason thereof.

''2. The chancellor erred in not decreeing that the reinstatement of the lapsed policies and the issue of the $10,000 policy were procured by the said J. C. Duncan by false statements, answers and representations, which were material to the risk of loss; and that by reason thereof the appellant should be relieved of all liability thereon, except its liability to return the premiums tendered by it into the registry of the court.

''3. The chancellor erred in not decreeing and holding that, in his application for reinstatement of the lapsed policies, and for the issue of the $10,000 policy, the said J. C. Duncan, with intent to deceive the appellant, misrepresented and concealed the condition of his health, his use of intoxicating liquors, his previous medical treatment, confinement and treatment in hospitals, etc., and that by reason thereof, the appellant should be relieved of all liability under said policies, except for the return of premiums.

''4. The chancellor erred in not adjudging and decreeing a rescission or cancellation of said policies of insurance, and perpetually enjoining the cross-defendants and each of them from suing the appellant upon said policies, or any of them.''

These assignments will be treated as one because they are, as we understand this record, one of the main points to be decided in this suit. Having found facts which we believe constitute fraud and misrepresentation in the procurement and reinstatement of the policies in question, we now apply the law to the facts.

The primary question for discussion is whether the applications for reinstatement of these policies, if not attached to the policies, could, under the sections of the code embraced in chapter 457 of the acts of the Tennessee Legislature of 1907, be considered as a part thereof; if this statute has application to the case at bar, then, everything else out of the way, the appellant must fail.

In order to defeat the contention of the appellees that these policies Nos. 1370342, 557396, and 940374, as reinstated, should not be set aside on the ground of fraud in their procurement, the point is made that inasmuch as the applications to reinstate were not at-

tached to the policies, the representations or warranties contained in such applications to reinstate have no application to the case at bar for the reason that they are not contained in the written applications and such applications or copy thereof indorsed upon or attached to the policy when issued. In support of this contention, section 1, chapter 457, of the Acts of 1907, is cited as follows:

"No policy of life insurance shall be issued in this State or be issued by a life insurance company organized under the laws of this State unless the same shall contain the following provisions:

. . .

"3. A provision that the policy shall constitute the entire contract between the parties, and shall be incontestable after two years from its date, except for nonpayment of premiums and except for violations of the conditions of the policy relating to naval and military services in time of war.

"4. A provision that all statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties, and that no such statement shall avoid the policy unless it is contained in a written application, and a copy of such application shall be indorsed upon or attached to the policy when issued."

To substantiate this contention it is claimed that the reinstatement of a policy was, in fact, the issuance of a new policy of insurance and counsel proceeds upon the theory that, when a policy of insurance has lapsed, all rights of both parties have terminated and upon a reinstatement of said policy a new contract is made as if the policy is then for the first time issued. In support of this view the case of Pacific Mutual Life Insurance Company v. Galbraith, 115 Tenn., 471, 91 S. W., 204, 112 Am. St. Rep., 862, is cited. We do not think that the statute quoted above has any application to the case at bar and we do not think we could suggest a better reason for this view than that cited by Mr. Justice Hall in the case of Linder v. Metropolitan Life Insurance Company, 148 Tenn., 236, 255 S. W., 43, 45, where the following language was used:

"It is insisted by defendant that neither of these statutes undertake to regulate the reinstatement of policies which have already issued, but have been permitted to lapse for the nonpayment of premiums, but only deal with the issuance of original policies. It is insisted that these statutes alter the common law on the subject with which they deal and must be strictly construed, and that nohing can be read into them by construction.

"'A statute will not be construed to alter the common law, further than the act expressly declares or than is necessarily implied from the fact that it covers the whole subject-matter.' Lillienkamp v. Rippetoe, 133 Tenn., 64, 179 S. W., 628, 629, L. R. A., 1916B, 881, Ann. Cas., 1917C, 901; Bennett v. Hutchens, 133 Tenn., 73, 179 S. W., 629.

"We are of opinion that defendant's contention is well taken. Neither of the statutes above referred to undertake to regulate the reinstatement of policies which have been permitted to lapse for the nonpayment of premiums, but only relate to the issuance of original policies. This interpretation is made clear by the very language of the statutes themselves. No reference whatsoever is made to the renewal or reinstatement of policies which have been issued. So, following the well-established rule of construction, these statutes must be construed as applying only to matters with which they deal in express terms.

"This court, in construing the statutes above referred to in Arnold v. Insurance Co., 131 Tenn., 720, 177 S. W., 78, held that warranties and representations made in the application could not be relied on as defense to a suit on the policy unless the application, or a copy thereof, was attached to the policy at the time it was issued. In that case the original policy and application were involved.

"The question of reinstating a lapsed policy is not dealt with by our statutes, and is therefore governed by the common law, and, it not being required by the common law that such application shall be made a part of or attached to the policy, defendant is not precluded from relying upon the misrepresentations made therein as a defense to the policy sued on."

This case, as cited above, deals with the very statute under consideration and almost the very question we have for decision here. In addition to what Judge Hall has said, we might further add that subsection 4, of section 3348a8, Shannon's Ann. Code, contains the following language:

"And a copy of such application shall be indorsed upon or attached to the policy when issued."

Now if we are going to construe this statute literally in order to make it apply to applications for reinstatement, how can it be said that a copy of such application for reinstatement shall be indorsed upon or attached to the policy when issued? This is an impossibility because the application for reinstatement more than likely would be taken a considerable time after the issuance of the original policy for the original policy must have run a sufficient time to have caused it to lapse—for some reason embraced within the terms of said original policy—and this being true, how could this application for reinstatement be attached to the policy at the time it was issued? Manifestly, the legislative intention was to make this act applicable to the original policies as stated by Judge Hall in the Linder case cited above. This statute has been construed by this court in the case of Equitable Life Assurance Society v. Cantwell, 4 Tenn. App., 635, and the view expressed by Judge Hall sanctioned and affirmed.

Then again, the Galbraith case was a case which was concerned solely with the question of the issuance of an original policy and

did not at all deal with the reinstatement question and was decided by our Supreme Court in September, 1905, whereas the Linder case was decided almost 18 years thereafter, in 1923, and is the latest expression of our court on this question and controlling not only on this account but because we believe the reasoning in the Linder case is sound and in harmony with proper rules for interpretation and construction of statutes and their relation to the common law.

Then it should be noted that the statute relied upon by the appellees and heretofore set out contained on its face the following provision:

"In the absence of fraud, be deemed representations and not warranties."

We have found that these applications for reinstatement of the three policies and for the issuance of the $10,000 policy contained fraudulent statements and such statements in said applications are under the law held to be warranties and not representations and under all of the law the assured is held liable upon such warranties for they entered into the very heart of the question involved, that is, the procurement of the policies themselves.

In Couch on Insurance Law, volume 4, section 870, one finds the following language as regards this point:

"870. Strict Truth and Literal Fulfilment Required.—As a general rule, and in the absence of modifying statutory regulation, a warranty in a contract of insurance must, if affirmative, be strictly and exactly true, else there is a breach; and, if promissory, must be literally fulfilled, or the contract is vitiated. This means that there can be no variance or departure in any particular as to any matter warranted, since the validity of the entire contract depends on absolute truth and conformity, the very purpose and meaning of a strict warranty being to preclude all questions as to the purpose, if any, for which it was made; and this, whether a breach proceeds from negligence, misinformation, or to whatever cause noncompliance is attributable. This rule clearly emphasizes the broad distinction as to their legal effect between a warranty and a representation, in that the latter need only be substantially true, and a misrepresentation or false representation must be of material matters, although, as previously stated, facts may be rendered material by stipulation. Again, the insurer is released by a breach of warranty in a policy of insurance, whether the breach diminished or increased the risk, or was committed for good or bad reasons, or with or without the consent of the insured."

For these reasons we are of the opinion that the applications for reinstatement would not have to be attached to the original policy and are binding on the assured and hence binding on the beneficiary and that this defense is not a valid one.

In addition to the above citations from Couch, one of the fore-

most authorities on this subject, we now cite the case of Hughes Bros. v. Ætna Insurance Company, 148 Tenn., 301, 255 S. W., 363, 365. This case construes section 3306, Thompson's-Shannon's Code, which section is as follows:

"No written or oral misrepresentation or warranty therein made in the negotiations of a contract or policy of insurance, or in the application therefor, by the assured or in his behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless such misrepresentation . . . is made with actual intent to deceive, or unless the matter represented increase the risk of loss."

We also quote the following from Crawford's Digest, section 4, page 3574:

"If assured falsely states, in his application for a life and accident policy, that his 'habits are correct and temperate,' and the truth of that statement is warranted and made the basis of the contract of insurance, and a condition precedent to the validity of the policy, the policy is void, and is not essential in such case, 'that the misstatement must be willful and intentionally made and known at the time to be false.' Insurance Co. v. Lauderdale, 94 Tenn., 635, 30 S. W., 732.

"False representation in application of matter which increases risk avoids the policy, though made in good faith, under Shannon's Ann. Code Tenn., section 3306; Columbian Nat. Life Ins. Co. v. Harrison (C. C. A.), 12 Fed. (2d) 986."

In the case of Hughes Bros. v. Ætna Ins. Co., citing the same section of the code above mentioned, the following language was used:

"Section 3306 of Thompson's-Shannon's Code has been considered very thoroughly in two late cases. Volunteer State Life Ins. Co. v. Richardson, 146 Tenn., 589, 244 S. W., 44 [26 A. L. R., 1270]; Mutual Life Ins. Co. v. Dibrell, 137 Tenn., 529, 194 S. W., 581, L. R. A., 1917E, 554.

"These cases show that the thing misrepresented need not necessarily be one that increases the hazard in the sense that it actually occasions or contributes to the loss. If on the contrary the matter misrepresented 'increases the risk' involved in the issuance of the policy, in the judgment of the court, then it may avoid the contract. Although the insured in Volunteer State Life Insurance Company v. Richardson, supra, did not die from the effects of strong drink, nevertheless, had the insurer not been misinformed about his drinking habits, the policy would not have issued, and it was held that the misrepresentation increased the risk and defeated recovery.

"The substance of these cases is that a misrepresentation about any matter of sufficient importance, in the opinion of the court, to naturally and reasonably influence the judgment of the insurer in

making the contract, is a misrepresentation that 'increases the risk of loss' within the sense of our statute."

It has further been held that whether representations by the insured increase the risk of loss is a question of law for the court. See Volunteer State Life Ins. Co. v. Richardson, 146 Tenn., 596-604, 244 S. W., 44, 26 A. L. R., 1270. In this case it should be noted that the court expressly held that misrepresentations by the insured that he did not use intoxicating liquors constituted ground for cancellation of the policy where it was established that the insured was an habitual user of intoxicating liquors. It should be observed that in the case at bar Mr. Duncan died, in July, 1929, from and as a result of the use of intoxicating liquors; the very habit that caused his death was the habit that he said he did not have. We especially call attention to the fact that not only did Mr. Duncan make direct, false answers to a few questions, but he made unsound answers to a number of questions. The following excerpts will illustrate this fact:

"Q. 13 a. Do you now use intoxicating liquors? b. To what extent? A. No.

"Q. 13 c. Have you ever used intoxicating liquors to excess? If so, express the duration and extent of excess and when last. A. No.

"Q. 16. Have you ever had any illness, disease, injury or operation other than as stated by you as above? If so, give full particulars, date, duration, severity, etc., of each. A. No."

Questions 11b, c, d, and e, in the application are as follows:

"Q. When were you last attended by a physician or consulted one and for what disease? Give details in full."

Mr. Duncan answered these questions as follows:

"June, 1917. Appendectomy, Dr. W. S. Nash, Knoxville, Tennessee, three weeks."

Now all of these statements were false and we are bound to assume that Mr. Duncan knew that they were false because this application for reinstatement of policies was taken on September 4, 1928, and previous to that time, and in the spring of the same year, as above detailed, he had been confined in the hospital for ten days with acute alcoholism, and given whisky as a remedy and attended by Dr. T. Ap. R. Jones, and previous to that time had been sick at his home and attended by a physician. Mr. Duncan also made gross misstatements as to previous sicknesses and ailments and the name of the doctor that waited on him is misrepresented. Would it not be the natural thing—if he had given the company correct answers to the questions and revealed the fact of his previous illness— for the company to investigate and find out when they occurred, what the nature of the same were, and who waited on him? This they could easily have done, but they were deprived of this in-

formation and evidently put off of their guard by his answers, as above stated.

As regards the effect of intoxicating liquors on the health and longevity of the party, we call attention to the opinion of Hon. L. D. Smith, Special Judge, who delivered the opinion of the Supreme Court in the case of Volunteer State Life Insurance Company v. Richardson, 146 Tenn., 606, 244 S. W., 44, 49, 26 A. L. R., 1270, above cited, which reads:

"In this case it is established that the applicant was an habitual user of intoxicating liquors. Certainly true answers to the questions asked would have indicated that to the insurer. It is well known that the habitual use of intoxicating liquors is calculated to impair the health; it weakens the resisting power of a man's constitution, if it does not directly cause disease. More than that, when he becomes intoxicated or uses liquor to excess he is liable to be less careful in guarding his health; he subjects himself to risks and hazards that a sober man does not incur. That liquor affects the brain, inflames the mind, and induces incautious conduct there can be no doubt. It is therefore but a reasonable and natural inquiry of an applicant for insurance as to the extent of his use of intoxicating liquors. Information such as called for in this application with regard thereto would naturally and reasonably be expected to influence the mind of the underwriter in determining whether a policy would be issued in accordance with the application. The insurance company was entitled not only to know whether the applicant's health has been impaired by the use of intoxicants, but also whether his habits were such as might increase the hazard of loss by subsequent impairment of his health or conduct which might most likely or probably affect the question of his longevity."

We quite agree with Mr. Special Justice Smith that the insurance company was entitled to know whether Mr. Duncan's habits were such as might increase the hazard of loss by subsequent impairment of his health or conduct which might most likely or probably affect the question of his longevity. In this case it is held that the insurance company was entitled to have the policy canceled. This was later followed by our Supreme Court in the case of Hughes Bros. v. Ætna Insurance Company, 148 Tenn., 293, 255 S. W., 363, above cited.

The fifth assignment of error of the appellant deals with the refusal of the chancellor to order counsels for appellees and the commissioner to file the depositions of L. A. Bible, Mrs. Emma McCabe, A. M. McCabe, and Mrs. W. C. Rector, which depositions were taken in shorthand before Edward Hacker, a notary public of Knoxville, Tennessee, and never filed by counsel for appellees. As we understand the law upon this subject, the court has no jurisdiction whatever over papers until they are filed in the case, es-

pecially when the matter is presented upon a motion. It is claimed that counsel for the appellant had no notice of the taking of the depositions. This being true had said depositions been filed they could have been excepted to and stricken from the record for want of such notice. If counsel for the appellants believed that the evidence of these witnesses was important, they might have given notice and taken the testimony of these witnesses themselves and we fail to see how counsel for the appellant or their client are injured by the taking of depositions which were not filed in the case and not considered in the trial. We are not cited to any law in Tennessee showing any requirement upon the part of counsel to file any proof taken in any case and it is generally recognized as a custom, if not a law, that counsel who take depositions without notice to opposite party have a right to control the use of their testimony up until the time it is filed and if not filed it is not evidence in the case and as such cannot be considered by the court.

As a young attorney, many years ago, the writer had the same question raised in a suit by the attorney-general of Tennessee who as an attorney was interested and a motion was made like the one at bar to compel counsel to file said depositions, but the court held that a party could not be compelled to file such papres and this ruling is in accord with the ruling of that court. The attorney-general of the state in that case searched in vain for authorities to overturn this decision but could find none. We therefore, overrule this fifth assignment of error.

The sixth assignment of error raises the question of whether or not the lower court should have allowed the attorney's fees for counsel for cross-complainant for the filing of the bill of interpleader. It would seem that it would have been necessary for the Penn Mutual Life Insurance Company, whether it contested liability on any of these policies or not in order to avoid liability in the case to have been compelled to file an answer to the original bill as it was made a defendant thereto. Such being the case and the matter of allowing a fee for the filing of a bill of interpleader being a matter of discretion with the court, we do not think under all the circumstances in this case such a fee should be allowed, and said sixth assignment is overruled. Inter-Southern Life Ins. Co. v. McDaniel, 159 Tenn., 489, 19 S. W. (2d), 269.

This leaves one other question to be disposed of and that is concerning any money paid into court by the Penn Mutual Life Insurance Company and held by the clerk and master as a tender of premiums paid on policies which could not be disbursed pending this litigation. The parties have already agreed that the policy upon which liability was admitted and proceeds of which has been paid into court should be and were paid to the assured, Mrs. Virginia Dingerson, but the money tendered into court on the policies

sought to be cancelled will be paid to the administrator of the estate of J. C. Duncan, deceased. The decision of the honorable chancellor of Knox county in dismissing so much of the cross-bill of the Penn Mutual Life Insurance Company as sought a cancellation of its policies No. 1370342 for $10,000, No. 940374 for $4,000, and No. 557396 for $5,000, is reversed and said policies are ordered cancelled and the premiums paid into court by the insurance company will be disbursed as above stated.

This disposes of all the assignments of error of appellant except assignment seven, which goes to the taxation of costs and this assignment is sustained, and the cost of this court will be taxed against the appellees and the cost of the lower court, except that embraced in the order sustaining the demurrer of Mrs. Virginia Dingerson Duncan to the cross-bill of J. C. Duncan, Jr., as administrator, will be taxed against the complainants below and Mrs. Virginia Dingerson Duncan for which executions are awarded.

Portrum and Thompson, JJ., concur.